IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EVE D. STEWART,

              Plaintiff,

                                         Civil No. 06-6298-ST

      v.                               OPINION AND ORDER

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,

              Defendant.

_____

STEWART, Magistrate Judge:

      Plaintiff, Eve D. Stewart ("Stewart"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Supplemental Security Income

("SSI") under the Social Security Act.  Stewart alleges that she suffers from a disability due to

degenerative disc disease, scoliosis, depression, anxiety, and post traumatic stress disorder

1 - OPINION AND ORDER

("PTSD").  Tr. 92.  All parties have consented to allow a Magistrate Judge to enter final orders

and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).  This court has

jurisdiction under 42 USC §§ 405(g) and 1383(c).  The Commissioner's decision is reversed for

the reasons that follow.

## BACKGROUND

Born in 1979, Stewart was 26 years old on the date of the hearing before the ALJ.

Tr. 468.[1]  Stewart has an eleventh grade education.[2]  Tr. 468-69.  Stewart grew up in California,

living part of that time near a military base.  Tr. 346.  Her parents were alcoholics and her father

was physically and emotionally abusive.  Her mother, who was fearful of him, did not intervene.

Tr. 346, 452.  Stewart reports that her father sexually abused her beginning at a very young age,

and that between the ages of 14 and 18, she was repeatedly raped by members of the US military

from the nearby base.  She believes her parents set her up for these rapes by giving the

perpetrators house keys and letting them know when she would be home alone.  Tr. 334, 383,

452.

During her teenage years, between early 1992 and early 1998, Stewart worked as a

waitress, bus person, and cashier at a fast-food establishment and a restaurant.  Tr. 93, 115, 469-

73.  She has not worked since February 1998 (Tr. 115), and identifies a car wreck that year, as

well as a rape that resulted in a pregnancy, and later birth of her daughter, as the triggering events

to her multiple emotional issues which render her disabled.  Tr. 92, 433, 450.

---

[1]  Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed with the
Commissioner's Answer on June 6, 2007 (docket #7).

[2]  Although her application indicated that she had completed her GED, Stewart did not remember checking that box
and testified that her education went only through the eleventh grade at the hearing.  Tr. 468-69.

On September 13, 2000, Stewart's car was rear ended while stopped.  Tr. 151-57, 162, 475.  Stewart, who was not wearing a seat belt at the time of the impact, was treated for a whiplash-type injury with a soft neck collar and Ibuprofen.  Tr. 156-57.  An MRI of Stewart's cervical spine revealed degenerative disc disease and mild circumferential bulging at the C3/4 level, without evidence of cord impingement or neuroforaminal encroachment.  Tr. 159.

At a follow-up appointment a month later, Stewart, then age 21, reported sharp 10/10 pain in her neck and low back as well as depression.  Tr. 162-63.  Stewart reported to the examining doctor that she had been raped multiple times in the past and that she wakes up with nightmares.  The doctor diagnosed her with depression, which the doctor suspected was "in part due to [PTSD]."  Tr. 163.  She received referrals to physical therapy and the Women's Center.  Tr. 164.  Following that initial diagnosis of her mental and emotional symptoms, Stewart has undergone multiple mental assessments and treatment appointments, dating through the hearing in this case.

Stewart applied for SSI benefits on August 2, 2002, alleging disability since January 30, 1999.  Tr. 84-86.  Her application was denied initially and upon reconsideration.  Tr. 62-63.  After a timely request for a hearing on February 7, 2003 (Tr. 64), the matter was heard by an Administrative Law Judge ("ALJ") on February 15, 2006.  Tr. 465-520.  On May 23, 2006, the ALJ found Stewart not disabled.  Tr. 13-25.  On September 19, 2006, the Appeals Council denied review of Stewart's application, making the ALJ's decision the Commissioner's final decision.  Tr. 6-8.  Stewart appeals.

///

///

3 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act. 20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140-42 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, then the claimant is not disabled. 20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month duration requirement. 20 CFR §§ 416.909, 416.920(a)(4)(ii). If the claimant does not have such a severe impairment, then she is not disabled.

At step three, the ALJ determines whether the severe impairment meets or equals a "listed" impairment in the regulations. 20 CFR § 416.920(a)(4)(iii). If it does, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by his impairments. 20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996). The ALJ uses this information to determine if the claimant can perform past relevant work at step four. 20 CFR § 416.920(a)(4)(iv).

If the claimant cannot perform past relevant work, then at step five the ALJ must determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's residual functional capacity. *Id.* If the Commissioner meets this burden then the claimant is not disabled. 20 CFR § 416.966.

## THE ALJ'S DECISION

The ALJ found that Stewart had not engaged in substantial gainful activity at any relevant time. Tr. 15. At step two, the ALJ found that Stewart has severe impairments, including depressive disorder, PTSD, borderline personality disorder, and marijuana dependence, but that she has no severe physical impairments. Tr. 15-17. Next, at step three, the ALJ found that Stewart's impairments did not meet or equal a listed impairment. Tr. 17-18. The ALJ then found that Stewart had no exertional limitations, but has non-exertional limitations stemming from her mental impairments. Tr. 18. As a result, the ALJ determined that Stewart's RFC is "restricted to simple, repetitive work with limited contact with the public and with co-workers." Tr. 18.

Based on these restrictions and the testimony of a vocational expert, the ALJ concluded that Stewart could not return to her past relevant work as a fast food worker, bus person, or waitress, but retains the ability to perform significant work in the national economy as, for example, a document preparer, packaging line worker, or a janitor. Tr. 24. Therefore, the ALJ found Stewart not disabled under the Act at any time through the date of his decision. *Id.*

Stewart challenges the ALJ's evaluation of the evidence, consequent RFC determination, and conclusion at step five.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r for Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id,* citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Magallanes v. Bowen*, 881 F2d 747, 750 (9th Cir 1989); *see also Batson*, 359 F3d at 1193.

## ANALYSIS

Stewart contends the ALJ improperly rejected her testimony, the opinion of an examining psychologist, and the information provided by a treating therapist. Due to improperly rejecting that information, Stewart contends that the ALJ set an RFC that does not adequately reflect all her limitations and did not meet his burden at step five.

## I.    Stewart's Credibility

Stewart contends the ALJ failed to accurately assess her credibility and improperly rejected her testimony concerning her limitations. Because the Commissioner contends that the ALJ properly rejected the opinions of an examining psychologist and treating therapists, based in

///

part on their reliance on Stewart's statements to them, this court first examines the ALJ's assessment of Stewart's credibility and rejection of her testimony and allegations.  The ALJ acknowledged that Stewart has medically determinable impairments which could reasonably be expected to produce some symptoms, but found that Stewart's "statements concerning the intensity, duration, and limiting effects of [her] symptoms are not credible."  Tr. 19.

In discrediting Stewart's testimony, the ALJ noted that:  (1) Stewart has "had rather normal medical findings at times;" (2) the medical expert found "huge" problems with Stewart's credibility; (3) Stewart's allegations had changed and were inconsistent with the documentary evidence; and (4) multiple medical providers had difficulty ascertaining the accuracy of Stewart's assertions and found her recitation of symptoms out of proportion with the objective findings.  Tr. 20.  As discussed below, this court concludes that the ALJ improperly rejected Stewart's testimony.

**A.     Legal Standard**

Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter*, 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995).  The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at 1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing a claimant's inconsistent

7 - OPINION AND ORDER

statements regarding symptoms by the claimant. *Id*. Once a claimant shows an underlying

impairment, the ALJ may not, however, make a negative credibility finding "solely because" the

claimant's symptom testimony "is not substantiated affirmatively by objective medical

evidence." *Robbins*, 466 F3d at 883.

### B. Discussion

#### 1. Malingering

The ALJ noted that medical providers found that Stewart had a "markedly embellished

presentation" and related symptoms "markedly out of proportion to the objective findings."

Tr. 20. Based on those observations, the ALJ concluded that her statements as to her degree of

impairment were "exaggerated." *Id*. Normally, this finding might allow the ALJ to conclude

that Stewart was malingering and, therefore, satisfy the burden of discrediting her testimony on

lesser evidence than that necessary to meet a clear and convincing standard. However, the

assertions offered by the ALJ in this regard uniformly relate to symptoms flowing from Stewart's

physical – not mental – impairments. Tr. 20-21. The ALJ concluded that Stewart suffers from

no significant physical impairments, and Stewart does not challenge that finding. Instead,

Stewart's bid for benefits rests on whether she is disabled due to mental impairments. Thus, the

inquiry about malingering must be directed at evidence related to those impairments.

It is abundantly clear that the ALJ simply did not believe Stewart's historical accounts of

childhood sexual abuse, Satan-worshiping parents, and multiple rapes and suicide attempts,

deeming her "stories . . . so bizarre that it is simply impossible to take her contentions seriously."

Tr. 22. However, other than the ALJ's speculation about Stewart's motivations, nothing in the

record supports the conclusion that Stewart was malingering with respect to her history and

related emotional issues.  To the contrary, her treatment providers believed that Stewart's

accounts accurately reflect her history and subjective beliefs as to her level of distress.  Tr. 386

("There are some contradictions in her story.  Regardless, her stories of mistreatment and sexual

abuse are probably accurate."), 335 ("Although she checks many problems, as we talk, I am

convinced this accurately reflects the level of distress [Stewart] is feeling.").  Moreover, the

stories (bizarre though they are) have stayed consistent over the course of Stewart's treatment,

supporting the conclusion that they are indeed accurate.  In short, the ALJ offered nothing more

than his own subjective belief that Stewart's stories were too bizarre to be accurate as a basis for

finding malingering with regard to her emotional issues.  That is insufficient.  Therefore, the

issue is whether the ALJ offered clear and convincing evidence in support of his decision to

discredit Stewart's testimony concerning the intensity of her psychologically based symptoms.

## 2. <u>Selective Quotes of Mental Status Examination Findings</u>

Stewart challenges the credibility finding of the ALJ in several respects.  First, Stewart

contends that the ALJ selectively quoted the findings in a September 2001 mental status

examination report.  That report was one of many pages out of a multidisciplinary evaluation and

admission assessment apparently completed after Stewart applied for assistance with the

Temporary Assistance for Needy Families (TANF) program shortly after she and her family

moved from California to Reno, Nevada.  Tr. 183.  The Commissioner cited that page in support

of the finding that Stewart had "rather normal medical findings, at times."  Tr. 20.  On the

disputed page (Tr. 187), the examiner checked various boxes, including those identified by the

Commissioner (unremarkable flow of thought, intact attention, concentration, insight, judgment,

and memory, reality oriented in thought content).  However, the examiner also checked the boxes

9 - OPINION AND ORDER

identified by Stewart (regressed behavior; hypo-activity; non-spontaneous and pressured speech; auditory hallucinations; and depressed, labile, and irritable mood).

The ALJ also cited a psychosocial assessment dated June 15, 2002. Tr. 244-48. In that assessment, an examining therapist at Options Counseling Services found Stewart to be well-groomed, calm, with intact thought processes, no hallucinations or delusions, and intact memory and judgment. Tr. 246. However, the examiner also found that Stewart had a labile affect and reported signs and symptoms of depression and PTSD. Tr. 246-47.

The ALJ did indeed selectively cite the information in the September 2001 assessment, and the June 2002 assessment likewise contains contradictory information consistent with Stewart's allegations. As such, neither the information in the ALJ's selective citation nor the information in the later assessment provide a clear and convincing reason to discredit Stewart's testimony.

### 3. Consistency of Allegations

As a further reason to discredit Stewart's testimony, the ALJ asserted that Stewart's allegations had changed and were inconsistent with the documentary evidence. However, the ALJ did not identify any specific inconsistencies in Stewart's reports to medical providers that withstand scrutiny. In particular, Stewart's allegation that she was a virgin prior to being raped is not necessarily inconsistent with prior childhood sexual abuse by her father; her report that she "loved to work" is not necessarily inconsistent with a relatively modest earnings history; and her lack of certainty about childhood experiences does not invalidate her current symptoms. By failing to provide any specific examples of true inconsistencies, the ALJ failed to meet the clear

and convincing standard to show that Stewart's reports were inconsistent and, therefore, unbelievable.

### 4. **Difficulties Experienced by Medical Expert and Treating Physicians**

The ALJ also points out that the medical expert found "huge" problems with Stewart's credibility and contends that multiple medical providers found it difficult to ascertain the accuracy of Stewart's assertions. Tr. 20. Again, the tenor of the ALJ's decision is simply that he did not believe Stewart's testimony as to her history. Despite the ALJ's misgivings about the accuracy of Stewart's recitation of her history, her treating mental health provider did not doubt the genuineness of the distress that Stewart's belief in that history caused. Moreover, the fact that medical providers noted difficulties ascertaining the historical accuracy of Stewart's statements says nothing about their belief in the symptoms she reported. The record does not support the conclusion that Stewart's treatment providers found any reason to question her recitation of the symptoms she experienced, whatever their cause. The ALJ's unsupported speculation about whether Stewart's stories were too bizarre to be believed is not a clear and convincing reason to reject her symptom testimony.

### 5. **Conclusion**

This court concludes that the ALJ failed to give adequate reasons to discredit Stewart's testimony concerning the intensity, duration, and limiting effects of her symptoms.

## II. **Medical Source Opinions and Statements**

The record reveals that the remaining points of contention between Stewart and the ALJ involve the findings by psychologist Jean Hale, Psy. D., who examined Stewart in November 2004, and the findings by qualified mental health professionals ("QMHP") Susie Meulemans

("Meulemans") and Tom Wheeler ("Wheeler"), and psychiatric nurse practitioner Christine

Menager ("Menager") who regularly treated Stewart between March 26, 2003 and April 13,

2004.  As discussed below, the ALJ failed to give adequate reasons for rejecting the opinion of

Dr. Hale and the information provided by Stewart's treating mental health care providers.

> A.  **Legal Standard**

The Social Security regulations distinguish between medical opinions which come from

"acceptable medical sources" and those that come from "other sources." 20 CFR §§ 404.1513(d),

416.913(d); *Gomez v. Chater*, 74 F3d 967, 971 (9th Cir 1996).  A licensed or certified

psychologist is an "acceptable medical source."  20 CFR §§ 404.1513(a)(2), 416.913(a)(2).

Nurse practitioners and therapists are "other sources."

In this case, one disputed opinion comes from a psychologist who examined Stewart.

Tr. 383-89.  An examining doctor's opinion is accorded greater weight than a reviewing doctor,

but less weight than a treating doctor.  *Edlund*, 253 F3d at 1157; *Lester v. Chater*, 81 F3d 821,

830 (9th Cir 1995).  The ALJ is responsible for evaluating conflicts between doctor opinions.

*Batson*, 359 F3d at 1195.  The opinion of a doctor is not necessarily conclusive to the ultimate

issue of disability, which is reserved for the Commissioner.  20 CFR §§ 404.1527(e)(1),

416.927(e)(1); *see also Morgan v. Comm'r*, 169 F3d 595, 601 (9th Cir 1999).

Nurse practitioners and therapists are not "acceptable medical sources," but are

considered "other medical sources."  20 CFR §§ 404.1513(d)(1), 416.913(d)(1).  Thus, the

testimony from these witnesses is assessed as lay witness testimony.  The ALJ may reject

opinions of lay witnesses by giving reasons that are "germane" to the witness.  *Lewis v. Apfel*,

236 F3d 503, 511 (9th Cir 2001).  The ALJ is also entitled to reject lay witness testimony that is inconsistent with medical evidence.  *Id.*

**B.  The Disputed Treatment History and Statements**

The central dispute between Stewart and the ALJ involves the ALJ's evaluation of Stewart's treatment by therapists and psychiatric nurse practitioners and assessment by Dr. Hale during 2003 and 2004.

On March 26, 2003, Stewart sought emergency treatment for suicidal ideation and depression after threatening to cut herself with a knife.  Tr. 457.  Stewart denied being actively suicidal, denied any hallucinations or delusions, and did not want to be hospitalized, but wanted to be evaluated.  *Id.*  Emergency room doctors diagnosed Stewart with depression, anxiety, PTSD, and borderline personality disorder, and provided "multiple outpatient referrals," including outpatient counseling.  Tr. 458, 460.

A week later, on April 4, 2003, psychiatric nurse practitioner Menager evaluated Stewart at South Lane Mental Health ("SLMH").  Tr. 343.  Following that appointment, Stewart regularly received therapy and medication management at SLMH through February 13, 2004.  Tr. 302-342, 357-69.  However, Stewart and her significant other then lost their house and became homeless for a period of time.  Since she missed appointments, SLMH terminated her file.  Tr. 353-56, 476, 482.  After a couple of months of homelessness, Stewart moved to Coos Bay and then to northern California.  Tr. 482.

Stewart and her family moved back to Eugene a little over a year later.  On June 13, 2005, Stewart returned to SLMH where she was evaluated by Melanie Twite, QMHP.  Tr. 402-07.

///

13 - OPINION AND ORDER

Four months later, on October 16, 2005, Meulemans and Menager jointly wrote a letter

summarizing Stewart's treatment at SLMH, stating that despite being "100% medication

compliant," Stewart continued to experience psychotic episodes, auditory hallucinations, trouble

managing her frustration, paranoia, depression, flashbacks, racing thoughts, angry outbursts,

problematic impulse control issues, poor judgment, and a "pervasive and unwarranted tendency

to interpret the actions or responses of other people as deliberately demeaning or threatening."

Tr. 420.  The letter also noted that Stewart's personality disorder made her symptoms difficult to

treat with medications:

> Her personality disorders are what makes [Stewart]'s condition the
> most difficult to treat.  She tends to have trouble responding to
> medication regime.  Her fixed personality disorder structure is a
> behavioral condition vs. a chemical imbalance.  Behavioral
> changes are usually much harder to stabilize than when the
> condition is solely a chemical imbalance issue.  At first, the
> medications will work for about a month and then she presents as
> getting worse.  Appropriate medications will be a constant
> challenge for [Stewart] to work towards stabilization.  If
> [Stewart]'s presentation was Schizophrenic based, we would see a
> dramatic difference in her behaviors with anti-psychotic
> medications.  This has not been the case.

Tr. 421.

Meulemans and Menager concluded that Stewart was unable to work "even in the most

structured setting with limited contact with people" and would "not be able to do even a low

stress job with a simple routine" based on her "lack of ability to manage her symptoms of anger,

poor impulse control, . . . distorted cognitive beliefs" and "inability to manage symptoms when

they escalate." *Id*.

A few weeks later, on November 2, 2004, Dr. Hale examined Stewart at the request of

Stewart's attorney.  Tr. 383.  On December 6, 2004, Dr. Hale completed a psychological

assessment and assessed Stewart with:  (1) PTSD; (2) severe recurrent major depression without

psychotic features, rule out with psychotic features; (3) an eating disorder NOS; (3) alcohol abuse

in sustained full remission by client report; (4) cannabis abuse; (5) borderline personality

disorder (Axis II); (6) scoliosis and degenerative disc disease (Axis III); (7) impending eviction,

chronic pain, and financial concerns (Axis IV).  Tr. 383-87.  Dr. Hale also assigned a present

Global Assessment of Functioning ("GAF") score of 55,[3] noting a highest GAF score in the

preceding year of 65.  Tr. 387.

Dr. Hale completed a Mental Residual Function Capacity Report ("MRFCR") finding

marked limitations in Stewart's abilities to:  (1) understand and remember detailed instructions;

(2) carry out detailed instructions; (3) perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; (4) work in coordination with or in

proximity to others without being distracted by them; (5) make simple work related decisions;

(6) complete a normal work day and work week without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and length

of rest periods; (7) interact appropriately with the general public; and (8) get along with co-

workers or peers without distracting them or exhibiting behavioral extremes.  Tr. 388-89.

Dr. Hale also found moderate limitations in Stewart's ability to:  (1) remember locations and

work-like procedures; (2) understand, remember, and carry out very short and simple

instructions; (3) maintain attention and concentration for extended periods; (4) sustain an

---

[3]  The GAF is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).  It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  A GAF score between 51 and 60 indicates "Moderate symptoms (*e.g.* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *Id.*

ordinary routine without special supervision; (5) ask simple questions or request assistance;
(6) accept instructions and respond appropriately to criticism from supervisors; (7) maintain
socially appropriate behavior and adhere to basic standards of neatness and cleanliness;
(8) respond appropriately to changes in the work setting; and (9) set realistic goals or make plans
independently of others.  Tr. 388-89.

### C.  Dr. Hale's Opinion and Mental Residual Function Capacity Report

The ALJ can reject an examining physician's opinion that is inconsistent with the
opinions of other treating or examining physicians, if the ALJ makes "findings setting forth
specific, legitimate reasons for doing so that are based on substantial evidence in the record."
*Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002), quoting *Magallanes*, 881 F2d at 751;
*Lester*, 81 F3d at 830.  In addition, an uncontradicted opinion may be rejected for clear and
convincing reasons.  *Thomas*, 278 F3d at 956-57.

The ALJ mentions Dr. Hale's report twice in his decision.  The first reference simply
notes that Stewart told Dr. Hale that her use of marijuana helped her to eliminate hallucinations
of "devil rats," which is the name she apparently gave to "little creatures that follow her around."
Tr. 16, citing Tr. 384.  The second reference quotes a statement in the report that Dr. Hale found
it "difficult to ascertain how accurate a historian Ms. Stewart is."  Tr. 20, quoting Tr. 386.
Neither of these references mentions the findings in Dr. Hale's report, explains the weight given
those assessments, or indicates why any particular portion of Dr. Hale's report was discounted or
disregarded.  In short, the ALJ provided no reasons whatsoever for discrediting the findings of
Dr. Hale.  This clearly does not meet the required standard whether or not Dr. Hale's opinion was
contradicted by other treating or examining physicians.

The Commissioner acknowledges the ALJ's failure to give any reasons for discrediting Dr. Hale's report, but contends that it was not reversible error because Dr. Hale's opinion is consistent with the ALJ's decision.  The ALJ did credit certain limitations consistent with Dr. Hale's findings.  *See* Tr. 18 (ALJ finding restriction to simple, repetitive work and limited contact with the public and coworkers) and 388-89 (Dr. Hale's MRFCR identifying marked and moderate limitations in various areas, as described above).  However the ALJ did not mention the MRFCR prepared by Dr. Hale, or offer any reason as to why the other limitations identified by Dr. Hale were not credited.  In particular, the ALJ did not find any limitation in items 7 (ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances), 11 (ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods), and 15 (ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes) as found by Dr. Hale.  As discussed below, this oversight clearly affected the ALJ's step five findings.  Tr. 518-19.

The Commissioner offers several other reasons as to why the ALJ properly disregarded Dr. Hale's opinion and MRFCR.  However, this court must adhere to the "bedrock principle of administrative law" that "[a] reviewing court can evaluate an agency's decision only on the grounds articulated by the agency."  *Ceguerra v. Sec'y of Health and Human Servs.*, 933 F2d 735, 738 (9th Cir 1991) (citation omitted); *see also*, *Connett v. Barnhart*, 340 F3d 871, 874 (9th Cir 2003) ("It was error for the district court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss.").  Even if the ALJ's silence were no barrier, the belated reasons offered by the Commissioner do not withstand scrutiny.  Specifically, the Commissioner

contends that the ALJ properly weighed the opinion in light of Dr. Hale's "admission" that it was difficult to ascertain the accuracy of Stewart's statements.  However, Dr. Hale's report was based not only on Stewart's presentation, but also on previous chart notes.  Tr. 386.  The Commissioner also contends that Dr. Hale assessed Stewart when she was non-compliant with treatment. However, the record at best shows that Stewart's condition intermittently improved with various medications, but never improved consistently or sufficiently to eliminate the limitations identified by Dr. Hale.  This difficulty was identified and discussed at length in the October 16, 2005 letter from Meulemans and Menager, discussed above.

Where an ALJ fails to provide adequate reasons for rejecting the opinion of an examining physician, "we credit it as a matter of law." *Widmark v. Barnhart*, 454 F3d 1063, 1069 (9th Cir 2006) (citation omitted).  As discussed below, properly crediting the opinion of Dr. Hale results in a finding of disability.

### D.  <u>Mental Health Providers</u>

Stewart also contends that the ALJ failed to give adequate reasons to reject the findings of Meulemans, her treating therapist.  Meulemans, along with other QMHPs at SLMH, regularly treated Stewart for an extended period of time.  As discussed above, Meulemans' findings must be evaluated under the same standard as that applied to lay witness testimony.  Such testimony cannot be disregarded without comment.  *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). Instead, if the ALJ wishes to discount lay witness testimony, the ALJ must give reasons that are germane to the witness.  *Id.*

The ALJ found that Meulemans' opinion did not deserve much weight, based on the ALJ's conclusion that Meulemans "merely recited" what Stewart told her and had been

"manipulated" by Stewart's efforts to keep receiving public benefits and avoid working.  Tr. 22-23.  However, the record reflects a variety of objective observations by the team members at SLMH that were based not on Stewart's reports, but on observations during therapy sessions. *See, e.g.*, Tr. 310 (needed to take breaks during conversation with AFS worker to "de-escalate," tended to get "very anxious and paranoid"); 338 (body moving in a "nervous fashion"); 357 (appeared overwhelmed and withdrawn); 358 (angry, upset, teary); 402 (irritable, tense, anxious, and shaking uncontrollably); 426 (irritable and depressed; fidgety and had some trouble remaining seated).  Moreover, no substantial evidence in the record supports the ALJ's accusatory conclusion that Stewart managed to dupe Meulemans and the other providers at SLMH into believing her stories and symptoms in order to avoid working.  There is certainly evidence that Meulemans advocated strenuously on behalf of Stewart.  However, given her longstanding treatment by the providers at SLMH, the multiple emotional issues identified as problematic by those providers, and Meulemans' conviction that Stewart functioned only marginally, and then only with the constant support of her significant other, this evidence is unsurprising.

## III.  Remand

After finding that the ALJ erred, this court has discretion to remand for further proceedings or for immediate payment of benefits.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision.  *Rodriguez v. Bowen*, 876 F2d 759, 763 (9th Cir 1989).  Thus,

19 - OPINION AND ORDER

improperly rejected evidence should be credited as true and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman*, 211 F3d at 1178, citing *Smolen*, 80 F3d at 1292.  Where it is not clear the ALJ would be required to award benefits were the improperly rejected evidence credited, the court has discretion whether to credit the evidence. *Connett*, 340 F3d at 876.

Here the ALJ improperly rejected Stewart's testimony, the opinion of Dr. Hale, and the observations of Stewart's treating mental health providers.  After rejecting these pieces of information, the ALJ relied upon an MRFCR completed by reviewing Drs. Anderson and Henry and the testimony of the medical expert, Dr. Dragovich, to establish Stewart's RFC.  Tr. 296-98. At the hearing, using this RFC, the ALJ posed a series of hypothetical questions to the vocational expert ("VE").  Tr. 514-15.  Based on the VE's testimony that this RFC did not preclude Stewart from performing work as a document preparer, packing line worker, and janitor, the ALJ found Stewart not disabled.  At the hearing, Stewart's attorney also posed a series of questions to the VE, specifically incorporating the limitations identified by Dr. Hale.  Tr. 518-19.  The VE concluded that the added limitations found by Dr. Hale would likely prevent performance of the identified jobs.  Tr. 519.  Thus, if credited, this evidence establishes that Stewart is incapable of performing substantial gainful employment.

Because no outstanding issues must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find Stewart disabled if

all improperly rejected evidence were credited, this case should be remanded for a determination and award of benefits.

## IV. **Supportive Environment Further Supports Award of Benefits**

This court concludes that benefits should be awarded on the basis of crediting the improperly discredited testimony, as described above.  Although not necessary to the above decision, at least one additional point is worth noting.  The record reveals that Stewart has been struggling emotionally for a decade.  Fortunately for Stewart, during that time she has had the benefit of the unwavering support of James Naylor ("Naylor"), her boyfriend/fiancé/husband and the father of her second child.  The record is abundantly clear that Naylor is the critical link that makes it possible for Stewart to manage the day-to-day struggles of simply existing.  The record repeatedly notes that Naylor is Stewart's sole support and only friend.  Tr. 352 ("relies on him completely for help with shopping, cooking, and getting her out of her room each day"); 353 (fiancé is her sole supporter).  Stewart relies heavily on Naylor to insure that her two children are cared for and that basic household tasks are completed.  Meulemans went so far as to declare that if Naylor were not readily available to care for Stewart's two children, Meulemans would recommend that Stewart not have custody of her two children "due to her inability to function appropriately as a parent."  Tr. 421.  In short, Stewart's ability to function for the past decade has been due, in large part, to Naylor's constant presence and support and Stewart's avoidance of leaving her home, thereby avoiding situations that increase her symptoms.

The Social Security regulations recognize that claimants with chronic mental impairments who have the benefit of structured or supportive environments may be much more impaired for

work than their symptoms and signs indicate.  This must be considered when evaluating the

effects of such impairments:

> E.  Chronic mental impairments.   Particular problems are often
> involved in evaluating mental impairments in individuals who have
> long histories of . . . prolonged outpatient care with supportive
> therapy and medication.  For instance, if you have chronic organic,
> psychotic, and affective disorders, you may commonly have your
> life structured in such a way as to minimize your stress and reduce
> your symptoms and signs. In such a case, you may be much more
> impaired for work than your symptoms and signs would indicate.
> The results of a single examination may not adequately describe
> your sustained ability to function.  It is, therefore, vital that we
> review all pertinent information relative to your condition,
> especially at times of increased stress.

20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(E) (2006).[4]

The regulations require consideration of the claimant's ability to function outside of

structured or supportive settings:

> F.  Effects of structured settings. Particularly in cases involving
> chronic mental disorders, overt symptomatology may be controlled
> or attenuated by psychosocial factors such as placement in a
> hospital, halfway house, board and care facility, or other
> environment that provides similar structure. Highly structured and
> supportive settings may also be found in your home. Such settings
> may greatly reduce the mental demands placed on you. With
> lowered mental demands, overt symptoms and signs of the
> underlying mental disorder may be minimized. At the same time,
> however, your ability to function outside of such a structured or
> supportive setting may not have changed. If your symptomatology
> is controlled or attenuated by psychosocial factors, we must
> consider your ability to function outside of such highly structured
> settings.

20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(F) (2006).

---

[4] This court applies the regulations in effect in 2006 to Stewart's claim.  *See Frost v. Barnhart*, 314 F3d 359, 371 (9th Cir 2002) (Beezer, J., concurring in part and dissenting in part).

In this case, there is little evidence concerning Stewart's ability to function without Naylor's constant support. Instead, the record reflects that Stewart rarely leaves her home and relies heavily on Naylor to both take care of her two children and prompt her to do basic things such as tend to her own hygiene. The most recent letter from Meulemans reflects this and suggests that a lack of a supportive environment would exacerbate Stewart's symptoms:

> [Stewart's] baseline presentation, at best, would involve her being in a very structured environment, assistance daily by her partner to help with ADL skills and prompting to work on behavioral changes/mood stability, and limited contact with people. At this time, [Stewart] avoids interacting with the public due to her tendency to have increased paranoia. She has a history of acting out inappropriately and will become very argumentative when she perceives people as threatening.

Tr. 421.

This evidence further supports the limitations suggested by Dr. Hale and the conclusion that Stewart cannot presently manage the rigors of employment.

## **ORDER**

Because the decision that Stewart did not suffer from disability and is not entitled to benefits under the Social Security Act is not based upon correct legal standards and supported by substantial evidence, the Commissioner's decision is REVERSED and this case is REMANDED for the calculation and award of benefits.

DATED this 31st day of March, 2008.

__/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge